# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| JOSEPH RYAN TAYLOR and<br>PENELOPE S. TAYLOR, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 24-00438-KD-M |
| | ) | |
| STATE FARM FIRE AND<br>CASUALTY COMPANY, | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>ORDER</u>

This action is before the Court on Defendant State Farm Fire and Casualty Company's ("State Farm") Partial Motion for Summary Judgment, State Farm's Memorandum in Support, Plaintiffs Joseph Ryan Taylor and Penelope S. Taylor's ("the Taylors") Response, and State Farm's Reply. The Motion for Summary Judgment is for the breach of contract as to replacement cost value under Coverage A, breach of contract under Coverage B, and the bad faith claim.[1] Upon consideration and for the reasons set forth herein, the Motion is **GRANTED in part and DENIED in part**.

### I.    Facts[2]

State Farm is an insurance company that provides policies for citizens of Alabama. (Doc. 1 at p. 13). The Taylors held a homeowners insurance policy with State Farm (Policy Number 01-BU-U134-7) for their property located at 218 West Rosetta Avenue, Foley, Alabama. (Doc. 40-2). This policy covered the property from March 21, 2020 to March 21, 2021. (Doc. 40-2 at p. 4). The terms of Coverage A of the policy contained an agreement that State Farm would "pay

---

[1] The Court is unsure why the Motion for Summary Judgment was termed partial, but assumes that there must be other claims not before the on Summary Judgment.

[2] The Taylors did not dispute any fact in State Farm's Brief in Support of its Summary Judgment Motion. The Taylors only sought to place additional facts in the narrative in their Response. However, those facts are disputed. The Court accepts only the facts that are supported by some evidence as true for the purpose of Summary Judgment.

for "accidental physical loss" (ADPL) to the dwelling and other structures on the property…

unless otherwise excluded or limited." (Doc. 40-2 at p. 33). The terms of Coverage B of the

policy covered personal property. (Doc. 40-2 at p. 40).

On September 17, 2020, the Taylors reported a claim of damage from Hurricane Sally to

State Farm. (Doc. 40 at p. 3).

### A. Relevant Policy Sections

1. **A1 – Replacement Cost Loss Settlement – Similar Construction.**
   a. **We** will pay the cost to repair or replace with similar construction and for the same use on the premises shown in the **Declarations**, the damaged part of the property covered under **Section I – PROPERTY COVERAGES, COVERAGE A – DWELLING**, except for wood fences, subject to the following:
      (1) until actual repair or replacement is completed, **we** will pay only the ***actual cash value*** of the damaged part of the property, up to the applicable limit of liability shown in the ***Declarations***, not to exceed the cost to repair or replace the damaged part of the property;
      (2) when the repair or replacement is actually completed, ***we*** will pay the covered additional amount ***you*** actually and necessarily spend to repair or replace the damaged party of the property, or an amount up to the applicable limit of liability shown in the ***Declarations***, whichever is less;
      (3) to receive any additional payments on a replacement cost basis, ***you*** must complete the actual repair or replacement of the damaged part of the property within two years after the date of loss, and notify ***us*** within 30 days after the work has been completed"

(Doc. 40-2 at p. 39).

2. "The term "actual cash value" is defined in the policy as follows:
   ***"actual cash value*** means the value of the damaged part of the property at the time of the loss, calculated as the estimated cost to repair or replace such property, less a deduction to account for pre-loss depreciation. For this calculation, all components of this estimated cost including, but not limited to:
   a. materials, including any tax;
   b. labor, including any tax;
   c. overhead and profit; are subject to depreciation.
   The depreciation deduction may include such considerations as:
   a. age;
   b. condition;
   c. reduction in useful life;
   d. obsolescence; and
   e. any pre-loss damage including wear, tear, or deterioration; of the damaged part of the property."

(Doc. 40-2 at p. 22).

    3. "For antique furniture, the Policy provides coverage as follows:
    b. **We** will pay market value at the time of loss for:
    (1) antiques, fine arts, paintings, statuary, and similar articles which by their inherent nature cannot be replaced with new articles;
    …
    However, *we* will not pay any amount exceeding the smallest of the following for items a. and b. above:
    (1) **Our** cost to replace at the time of loss;"

(Doc. 40-2 at p. 40).

    4. "The Policy contains the following "Appraisal" provision, in relevant part:

    4. Appraisal. If you and we fail to agree on the amount of loss, either party can demand that the amount of loss be set by appraisal. Only you or we may demand appraisal. A demand for appraisal must be in writing. You must comply with SECTION I – CONDITIONS, Your Duties After Loss before making a demand for appraisal. At least 10 days before demanding appraisal, the party seeking appraisal must provide the other party with written, itemized documentation of a specific dispute as to the amount of the loss, identifying separately each item being disputed.

…

    h. Appraisal is only available to determine the amount of the loss of each item in dispute. The appraisers and the umpire have no authority to decide:
        (1) Any other questions of fact;
        (2) Questions of law;
        (3) Questions of coverage;
        (4) Other contractual issues; or
        (5) To conduct appraisal on a class-wide basis."

(Doc. 40-2 at p. 42).

## B. Coverage A Claim

After Hurricane Sally impacted the area, the Taylors contacted State Farm regarding extensive damage to their dwelling that occurred on September 16, 2020. Lori K. Wiggins ("Wiggins") contacted the Taylors about their claim on September 18, 2020. The Taylors reported the damage to their house as trees collapsing onto the house and blocking the front door, broken windows and doors, water damage and the roof collapsed in certain rooms of the house. Wiggins explained the policy to the Taylors including the hurricane deductible of $21,150.00. In the days following this initial phone call, the Taylors and Wiggins were in contact about the damage, sending photographs of the damage, and mitigating the damage. On September 23,

2020, the inspection of the property was scheduled.

On October 3, 2020, Claim Specialist Jeffery Digenova ("Digenova") inspected the Taylor's property with the Taylors. The Taylors, before the inspection with Digenova, did an inspection on the property with the mitigation company Rainbow International. Rainbow International tested for asbestos and found three asbestos particles present in the popcorn textured ceilings. Rainbow International placed black X's on walls and flooring they determined should be removed. According to State Farm, this is not usual business practice. Digenova inspected the roof and other damage to the property including the fencing and porte cochere. Digenova noted that there was a previous claim for roof damage that had not been resolved and the amount for that repair would need to be deducted from the total amount of repair for this claim. Before concluding the inspection, Digenova shared his findings and explained the process moving forward.

Digenova's findings were reviewed with State Farm Team Manager Ted Kolp on October 6, 2020. Once the asbestos finding was confirmed, Kolp advised Digenova to write the estimate on the Taylor's property and place an open bid for the asbestos abatement that would need to be completed. Digenova contacted the Taylors about their previous roof damage claim and the asbestos, and the Taylors informed Digenova they contacted a mitigation company for the removal and abatement of the asbestos.

On October 23, 2020, Claim Specialist Kevin Johnston ("Johnston") and Team Leader Steve McQuown from State Farm along with the Taylors' roofer, Platinum Roofing, inspected the roof in the garage, the areas where asbestos was found and walked through to confirm the scope of damage to the property. At the inspection, Mr. Taylor was present and informed State Farm that they would not be using Rainbow International for the mitigation services and would be using McMurray Contracting ("McMurray") instead. Johnston observed the black X's placed on areas of the property by Rainbow International and inquired to why they were there, especially on areas that did not seem to be damaged. Johnston explained that State Farm could

not just repair an area because Rainbow International marked with a X when that area did not show signs of damage. Johnston inspected the roof again to confirm his findings, and before leaving, explained he would be working on the estimate.

On October 28, 2020, Johnston called the Taylors to inform them that State Farm would paint the walls Rainbow International put Xs on that were not damaged. Johnston completed his estimate for the damages on October 29, 2020. The total damage under coverage A was $139,140.75 - $130,277.82 of that amount was to the dwelling itself and $8,862.93 of that amount was to extensions of the dwelling. The Coverage B damage to personal property was totaled at $368.50, and $1,000 was contributed to tree debris removal. After a portion of the policy deductible and depreciation was applied, the total claim payments issued on October 29, 2020 was $90,519.16. Once the claim was finalized, Johnston met with the Taylors to explain the estimate, payments, deductions from the prior claim of roof damage, and that the estimate did not include mitigation for the asbestos or water damage. The Taylors were responsible for receiving an estimate for the mitigation of the asbestos and water damage. During the meeting, the Taylors gave Johnston permission to share a copy of the estimation with McMurray and Platinum Roofing.

When Johnston met with Mr. Taylor on November 11, 2020, Mr. Taylor did not provide State Farm with his contracts with McMurray and Platinum Roofing as expected. Johnston explained that State Farm needed the mitigation/ abatement estimate from their contractor. Approximately two months later, McMurray contacted Claim Specialist Matthew Henderson ("Henderson") requesting that State Farm release the replacement cost benefits provided in the policy. State Farm is not required to release these funds until the repairs are completed. But because Henderson believed the repairs were completed, he issued the claim payment for the replacement cost benefits in the amount of $18,629.96.

The total estimate that McMurray submitted to State Farm for mitigation/ abatement was $22,997.00. State Farm requested a second estimate and one that was line-itemized. After several

5

discussions about the mitigation/ abatement and an estimate submitted by the Taylors prepared by Hernandez Demolition and Remediation, State Farm paid $27,5596.40 for mitigation and abatement.

Justin Palmer ("Palmer") – a "Property Claim Manager" for McMurray – emailed State Farm a repair estimate totaling $161,638.36 at the beginning of February 2021. Henderson reviewed this estimate from McMurray and found this estimate to be higher than State Farm's, so it required reconciliation. On February 24, 2021, Claim Specialist Darrell Martin ("Martin") from State Farm spoke to Mrs. Taylor and she informed him that work had begun but more damage had been found on the property. Mrs. Taylor also informed Martin that McMurray would submit a revised estimate based on the additional damage found. Henderson investigated the differences in scope and pricing between McMurray's $161,683.36 estimate and State Farm's $139,140.75 estimate and found discrepancies between the two. Henderson then emailed McMurray to begin reconciling the two estimate and emailed Mrs. Taylor an update on her claim's status. Mrs. Taylor informed Henderson that she desires the repairs to be completed by September 2021.

On March 2, 2021, Palmer contacted Henderson and informed him that he sent the wrong estimate from McMurray and that the $161,683.36 total was incorrect. Palmer stated the correct estimate would be sent to State Farm shortly. At this point, it was five months after the damage occurred, and four months after McMurray was hired and State Farm finalized its estimate. Over the next month, Henderson contacted McMurray attempting to receive the corrected estimate and each time Henderson was informed it would be coming soon or was almost completed. During the second contact, Palmer informed Henderson that McMurray had not begun making repairs on the property because they were waiting on payment. During the third contact, Palmer informed Henderson that McMurray would not begin the repairs until the estimate was completed although State Farm had already paid over $100,000. Henderson contacted Mrs. Taylor and Mrs. Taylor informed Henderson of her issues with McMurray as well since the floors were still damp and no

drywall had been removed. McMurray sent their estimate to State Farm on April 12, 2021. The total amount for the estimate was $443,547.27.

On May 5, 2021, Henderson provided an update to the Taylors on their claim and informed them that State Farm was reconciling its repair estimate with McMurray's and that the mitigation/ abatement estimate was already reviewed. State Farm issued an additional payment for mitigation and abatement in the amount of $27, 596.40 on May 18, 2021. After issuing the payment, State Farm contacted Mrs. Taylor to explain the mitigation payment and status of the claim.

On June 7, 2021, Mr. Taylor contacted State Farm and expressed dissatisfaction with the repair process. State Farm informed Mrs. Taylor that repairs could not begin until State Farm reconciled McMurray's estimate. Mr. Taylor then told State Farm that an entire rebuild would be necessary and that repairs would not be cost effective. Later, Palmer called State Farm and said the same. When State Farm inquired about some of the discrepancies between the two estimates, Palmer was unable to provide an answer and said that he did not have any knowledge about the estimation process and was only there to communicate between the parties involved.

Claim Specialist Marilyn Bouchard ("Bouchard") talked to Mrs. Taylor on June 30, 2021 about the status of the claim and the repairs. Mrs. Taylor told Bouchard that the property had not been worked on since March 2021 and that McMurray told the Taylors the house was not repairable, so the Taylors and McMurray decided not to pursue repairs. Mrs. Taylor also told Bouchard the roof was still leaking and that the house was going to "rack and ruin." Bouchard suggested action be taken on the roof to prevent further damage, but Mrs. Taylor rejected that idea because of her belief that the house was a total loss. Once the call with Mrs. Taylor ended, Bouchard called Palmer and requested McMurray take action to prevent further damage to the property from the leaking roof.

Approximately a week later, Bouchard called Mrs. Taylor to update her on the status of the claim and to explain the reconciliation process had started but it would take time to be

completed. Claim Specialist Gary Jackson ("Jackson") informed the Taylors on July 9 and 11, 2021 that he was reconciling the McMurray estimate and would send them his contact information. On July 30, 2021, Jackson met with Jason Steingrubey from McMurray for a walkthrough of the property. Jackson noted during the walkthrough that most of the interior finishes were removed and that he needed to review the file to evaluate the damage documentation and mitigation. The two spoke again on August 25, 2021 and Jackson told Steinburgey that he would return to the property to measure the quantity of materials.

State Farm sent a letter to the Taylors on September 1, 2021, informing them that additional inspection was needed in order to know the quantities of materials that were removed during mitigation. State Farm also told the Taylors they would keep them updated on the progress of their claim. Jackson returned to the property on September 2, 2021 and took photographs of the property to document the mitigation efforts. On September 24, 2021, Jackson contacted the Taylors and told them he was processing the comparison of McMurray's estimate and State Farm's estimate, but that there were some issues since the contractor did not inform Jackson of the quantities of materials moved from the property.

On October 1, 2021, Jackson revisited the property for a more thorough walk through, contacted Palmer about the work performed by McMurray and then provided an update to Mrs. Taylor on the reconciliation process. Once Jackson completed his reconciliation between McMurray and State Farm's estimates, he found several discrepancies. These discrepancies resulted in Jackson finding State Farm owed the Taylors additional money in some instances, and in others, Jackson found McMurray overpriced State Farm. Some notable discrepancies Jackson found include:

- Even though McMurray was not involved in the tree removal, they tried to claim overhead and profit ($8,400) for that work in their estimate.
- McMurray included tarping the roof in their estimate, but they did not do that work.
- McMurray included the wrong type of roofing tiles.
- McMurray included ice and water shield for the roof, even though it is not required in Baldwin County and was not present on the roof prior to Hurricane Sally.

- McMurray included the replacement of the A/C units when there was no documentation that they were damaged.
- McMurray estimated for 4½ inch crown molding and baseboards when the Property only had 3½ inch crown and baseboards.
- McMurray included replacement of all the cabinets and the countertop even though they were not damaged.
- There was no damage to the stucco or soffit, but these items were included in McMurray's estimate.
- McMurray included the replacement of ductwork that was not damaged.
- McMurray did not deduct for openings in windows and doors.

On October 5, 2021, Jackson reviewed the reconciliation with Team Manager Gregor Strickland ("Strickland") and they noted several undamaged rooms were gutted and this was included in the McMurray estimate. Jackson, Strickland and Team Manager Mike Henderson then went over the reconciliation of the claim on a three-way call. Before the State Farm revised estimate was finalized, Strickland reviewed the reconciliation and claim with Henderson and a Section Manager.

On November 18, 2021, State Farm received a letter of representation from Warhurst Law pertaining to this matter. State Farm issued a supplemental payment to the Taylors on November 19, 2021 based on Jackson's reconciliation totaling $65,266.81. This payment brought State Farm's total replacement cost estimate under Coverage A to $221,433.40.

Hamilton Jordan from Warhurst law emailed State Farm an updated estimate from McMurray on December 10, 2021. The updated estimate totaled $436,582.39. There were minimal differences between the first estimate and second estimate from McMurray. Because of this, Claim Specialist Jolene Cropp ("Cropp") contacted Warhurst Law and informed them State Farm already reconciled McMurray's estimate and asked them to review previous correspondence between the two. Cropp also asked the attorney to send any additional information State Farm needed to review. Three days later, Cropp sent the Taylors a letter stating State Farm had yet to receive requested information such as building permits, status of the

rebuild and a schedule for the construction. The letter also informed the Taylors State Farm would further consider the claim once this information was received and reminded the Taylors of their duties under the policy. Then, Cropp reviewed the estimate and made an extensive list of the discrepancies between the new McMurray estimate and State Farm's estimate. Cropp also made note that the Taylors had not started repairs and McMurray refused to do any work until State Farm paid their estimate in full.

On January 4, 2022, Warhurst Law sent a demand for appraisal to State Farm citing the second estimate from McMurray as the basis for the appraisal. State Farm responded to Warhurst Law on January 24, 2022 with the appraisal clause from the Policy and explained that the appraisal provision resolved differences in the price of repairs which State Farm covers under the Policy. State Farm also explained that appraisal would be inapplicable in this situation because there now was a dispute due to McMurray's second estimate.

On February 7, 2022, State Farm issued its last payment to the Taylors reimbursing them for their deductible on overages incurred for Coverage C. Cropp followed up with the Taylors on February 25, 2022 about the additional information which was previously requested so that State Farm could finish its evaluation.

On March 4, 2022, Warhurst Law informed State Farm they were no longer representing the Taylors and Cropp confirmed the recently issued payments would be provided to the Taylors. State Farm sent another letter to the Taylors on March 7, 2022 regarding the requested information the Taylors had not sent State Farm. The Taylors bought a replacement home in April 2022 after selling the property.

After the claim went inactive for most of the year, Claim Specialist Laurence Hoskins ("Hoskins") sent a letter to Mr. Taylor on November 2, 2022 informing him that State Farm tried

contacting him regarding his claim and requested that he contact State Farm. On December 9, 2022, Smith Prestwood ("Prestwood") of Prestwood Law Firm sent State Farm a letter of representation on behalf of the Taylors. Along with the letter, Prestwood attached McMurray's third estimate of the property placing the total repair cost at $506,152.74. The third estimate added a line item to the second estimate in the amount of $12,969.60 for framing repair for the carport of the property. When Hoskins contacted Prestwood to discuss the claim on January 31, 2023, Prestwood informed her that the Taylors sold the property and purchased a new property.

When Hoskins spoke to Prestwood on May 5, 2023, Prestwood stated he understood that the only remaining part to be reconciled on the Coverage A claim was the added line item of the carport, and Hoskins agreed. On July 12, 2023, Claim Specialist Maralee Griffith spoke with Prestwood about the Coverage A claim. Prestwood expressed that he wanted to settle the Coverage B claim before settling the Coverage A claim, so their conversations mainly pertained to the Coverage B claim. On August 4, 2023, Claim Specialist Donna Hrosik ("Hrosik") spoke to Prestwood to inform him her assessment of the third McMurray estimate was the same as the prior adjusters' assessments, and that the only remaining issue was the additional item of the carport. Hrosik and Team Manager Phyllis Mullins reviewed the third McMurray estimate and found State Farm owed no additional amount to the Taylors.

State Farm sent a letter to Prestwood detailing the amount paid for the Coverage A claim - $216,911.21 – was the total amount the Taylors would receive since they no longer had an insurable interest in the property once it was sold. The letter explained that the Taylors could not receive the replacement cost benefits since they sold the property without making any repairs, and if they claimed any new damage, State Farm no longer had the ability to assess the Property. In total, the State Farm coverage under the policy was: Coverage A – Dwelling: $210,112.06;

Coverage A – Dwelling Extension: $11,612.31; Coverage B – Personal Property: $194,054.38;

Coverage C – Loss of Use: $136,671.00; Tree Debris Removal: $1,000.00; for a total of

$553,449.75. Of this amount, the Taylors received $511,873.22.

### C. Coverage B Claim (Personal Property)

The Taylors submitted many items of personal property in their claim under Coverage B,

but the only item still at issue is the Eighteenth Century French Antique – Louis XIV Style,

Antique Commode with Mirror ("Antique Dresser"). The parties dispute whether the Antique

Dresser is from the Eighteenth or Nineteenth Century. The Taylors claimed the value of the

Antique Dresser as $17, 600 after taxes. This amount was based on a listing found on

www.1stdibs.com. State Farm requested photos of the Antique Dresser from the Taylors.

On September 28, 2024, Team Manager Lester wrote that State Farm would look for

similar items to the Antique Dresser to find an accurate price. Team Manager Lester also noted

that the amount the Taylors submitted for the Antique Dresser seemed to be the highest price

instead of the average of the prices found since most items like the Antique Dresser fell within a

certain range. On October 10, 2024, Hrosik determined the market value for the Antique Dresser

to be $4,215. He determined this by finding five similar antique dressers on the 1stdibs.com

website. Team Manager Lester collaborated with Hrosik on this estimate and noted that this

amount was determined after extensive research. The final estimate for the Antique Dresser State

Farm submitted to the Taylors was $4,636.50 - $4,215.00 plus $421.50 in taxes.

On October 17, 2024, Hrosik informed Prestwood that the supplemental payment for

Coverage B was in the process of being issued and explained how the amount for the Antique

Dresser was determined. Prestwood responded requesting links to the listings State Farm had

based its estimate on from the 1stdibs.com website because Prestwood claimed he was unable to

find a listing at the $4,215.00 price. Hrosik was unable to review Prestwood's email until two

weeks later as he was out of the office. Hrosik was unable to provide Prestwood with the exact

links because prices had changed within the three weeks since the determination of price was made and some of the listing may have sold. Hrosik responded to Prestwood saying that State Farm had paid its total of $158,291.01 under Coverage B and found its settlement estimates accurate.

### D. Post-Filing Proceedings

The Taylors were deposed as a part of the litigation and confirmed no repairs were made on the house. The Taylors also testified to not being aware that McMurray waited seven months after the storm to submit their initial estimate to State Farm. The Taylors also confirmed their listing of the property in September 2021, and that it sold in March 2022. Lastly, the Taylors informed State Farm of their experts for the claim under Coverage A and no expert was identified to testify to the market value of the Antique Dresser under Coverage B. Mrs. Taylor did research the Antique Dresser and found a "comp" listed on the 1stdibs.com website and in her interrogatories stated that the value of the dresser was $22,500.00.

## II.    Summary Judgment Standard

Summary judgment is granted in a case when "there is no genuine dispute of material fact, and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is considered material when it could alter the outcome of the case. Zaben v. Air Products & Chemicals, Inc., 129 F.3d 1453, 1455 (11th Cir. 1997) (citing Anderson at 248).

Summary judgment functions to discard claims or defenses that are not adequately supported by the facts. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). One purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see if there is a genuine need for trial." Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e).

A genuine issue for trial is nonexistent when a reasonable jury would be unable to find for the nonmoving party based on the facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.

475 U.S. 574, 587 (citing First Nat. Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

Although the facts are viewed in the most favorable light to the nonmoving party, the nonmoving

party bears the burden of designating specific facts to show that a genuine issue to be solved at

trial exists. Id. The nonmoving party must establish more than doubt regarding the material facts

to proceed to trial. Id. at 586 (citations omitted). An alleged factual dispute will likewise be

insufficient to establish a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 247-48 (1986).

Therefore, when the moving party meets their burden and the nonmoving party does not

convincingly show a dispute of the facts, the motion for summary judgment shall be granted.

Fed. R. Civ. P. 56(a). A motion for summary judgment is properly granted when the "pleadings,

depositions, answers to interrogatories, and admissions on file" are considered and relied upon in

the decision. Celotex, 477 U.S. at 324.

### III.    Discussion

### A. Breach of Contract

In the Complaint, the Taylors summarily allege that State Farm breached their contract

"by failing to pay Plaintiffs the full and correct amount of benefits and coverage rightfully due

under the Policy." (Doc. 1 at p. 15). Plaintiffs also allege that "[a]s a direct and proximate result

of Defendant's breach, Plaintiffs have suffered damages." (Id.).

Under Alabama law, "[t]he elements of a breach-of-contract claim under Alabama law

are (1) a valid contract binding the parties; (2) the plaintiffs' performance under the contract; (3)

the defendant's nonperformance; and (4) resulting damages." Dupree v. PeoplesSouth Bank, 308

So. 3d 484, 490 (Ala. 2020) (quoting Shaffer v. Regions Fin. Corp., 29 So. 3d 872, 880 (Ala.

2009) (internal quotations omitted). The parties do not dispute that there is a valid contract

binding the parties. However, there are disputes for the remaining three elements.

In its Brief for Summary Judgment, State Farm claims that the Taylors did not perform their duties under the policy for Coverage A because they did not complete the repairs or replacements on the property within two years of the damage to the dwelling. Under Coverage B of the policy, State Farm moves for Summary Judgment because the Taylors cannot prove State Farm's estimate of the Antique Dresser is incorrect and it is their duty to do so.

### i. Coverage A

State Farm claims that under Coverage A the Taylors are only entitled to recover the actual cash value ("ACV") of the cost of repair until repairs are completed. ACV, under the policy, is the replacement cost value ("RCV") (the cost of repairs) less deprecation of the damaged items based on their age and condition. (Doc. 40-2 at p. 8). According to State Farm, the Taylors would only be entitled to recover RCV if the repairs are completed within two years of the damage. Since the Taylors did not complete any repairs on the property within the two-year timeframe, State Farm argues that the Taylors did not complete the "condition precedent" necessary to receive the RCV.

The Taylors argue in their Response that they are entitled to the RCV because the payment is not dependent on the repairs or replacement occurring on the property where the damage occurred. The Taylors argue that since they replaced their damaged home with a new home in another location, they are still entitled to the RCV. In support, the Taylors claim that the language of the policy requiring repair or replacement of the property is ambiguous to whether the repair or replacement must occur *on* the property. The specific policy provision that the Taylors are referencing is part a.(2) of the A1 – Replacement Cost Loss Settlement – Similar Construction section. The whole section states as follows:

1. **A1 – Replacement Cost Loss Settlement – Similar Construction.**
   a. **We** will pay the cost to repair or replace with similar construction and for the same use on the premises shown in the **Declarations**, the damaged part of the property covered under **Section I – PROPERTY COVERAGES,**

**COVERAGE A – DWELLING**, except for wood fences, subject to the following:

> **(1)** until actual repair or replacement is completed, **we** will pay only the ***actual cash value*** of the damaged part of the property, up to the applicable limit of liability shown in the ***Declarations***, not to exceed the cost to repair or replace the damaged part of the property;
>
> **(2)** when the repair or replacement is actually completed, ***we*** will pay the covered additional amount ***you*** actually and necessarily spend to repair or replace the damaged party of the property, or an amount up to the applicable limit of liability shown in the ***Declarations***, whichever is less;
>
> **(3)** to receive any additional payments on a replacement cost basis, ***you*** must complete the actual repair or replacement of the damaged part of the property within two years after the date of loss, and notify ***us*** within 30 days after the work has been completed"

(Doc. 40-2 at p. 39). The Taylors contend that because section (3) does not repeat that replacement must be on the premises that the policy is ambiguous.

Insurance policies containing ambiguous language must be construed "strictly against the insurance company" and "in light of the interpretation that ordinary men would place on the language used therein." Ho Bros. Rest. v. Aetna Cas. & Sur. Co., 492 So. 2d 603, 605 (Ala. 1986) (citations omitted). However, insurance policies are also not to "be read in isolation, but, instead, each provision must be read in context with all other provisions." Allstate Ins. Co. v. Hardnett, 763, 765 So. 2d 963 (Ala. 2000) (citing Attorneys Ins. Mut. of Alabama, Inc. v. Smith, Blocker & Lowther, P.C., 703 So.2d 866, 870 (Ala. 1996); Hall v. American Indemnity Group, 648 So.2d 556 (Ala. 1994)). Further, "[i]nsurance contracts, like other contracts, are construed to give effect to the intention of the parties and, to determine this intent, the court must examine more than an isolated sentence or term; it must read each phrase in the context of all other provisions." Hall v. Am. Indem. Grp., 648 So. 2d 556, 559 (Ala. 1994) (citing State Farm Mut. Auto. Ins. Co. v. Lewis, 514 So.2d 863 (Ala. 1987).

When the policy section is read in context, it is clear that the repairs or replacement must

be completed "on the premises shown in the **Declarations**." Paragraph (3) merely explains when replacement benefits can be received. Therefore, any RCV benefits only accrue when repairs and replacements are completed on the property. The Taylors did not make any repairs or replacements on the property within the two-year timeframe set out by the policy, so they are not entitled to receive RCV. Accordingly, summary judgment is **GRANTED** as to this claim.

### ii.  Coverage B

On summary judgment, State Farm asserts that the Taylors cannot meet their burden to prove the amount of damages they are owed for the Antique Dresser under Coverage B. State Farm argues the Taylors have not put forth any admissible evidence to the market value of the Antique Dresser, and so, this would require a jury to speculate the amount of damages. Since a jury would be left to speculate, State Farm argues they are entitled to Summary Judgment because the Taylors have not met their burden.

The Taylors, in their Response, argue that they did submit admissible evidence from Mrs. Taylor on the market value of the dresser. The Taylors assert that they used the same process State Farm did to find the value of the Antique Dresser, i.e. 1stdibs, and that Mrs. Taylor's valuation of the dresser comes from decades of ownership.

In State Farm's Reply, State Farm asserts that the Taylors cannot rely on Mrs. Taylor's speculative value and that the 1stdibs.com listing is inadmissible evidence.  State Farm fails to support the latter assertion with any authority.  Nor does State Farm explain why they found 1stdibs to be reliable evidence, but now believes it to be unreliable for estimating value of antique furniture. The Court finds there is a genuine issue of material fact as to the market value of the Antique Dresser. Therefore, summary judgment is **DENIED** on the breach of contract claim under Coverage B.

### B.  Bad Faith

In the Taylor's Complaint regarding bad faith, they allege that State Farm intentionally

refused to fully pay their claim and that "no reasonably legitimate or arguable reason for Defendant's refusal to fully pay Plaintiffs' claim" exists and that State Farm has actual knowledge of this. The Taylors also claim that they have suffered damages as a direct and proximate cause of State Farm's alleged bad faith.

State Farm moves for summary judgment on the bad faith claim. The elements are: "(1) a breach of an insurance contract; (2) a refusal to pay the claim; (3) the absence of an arguable reason for failing to pay; and (4) the insurer's knowledge of such an absence. State Farm Fire & Cas. Co. v. Brechbill, 144 So. 3d 248, 256–58 (Ala. 2013); Walker v. Life Ins. Co. of N. Am., 59 F.4th 1176, 1186 (11th Cir. 2023). State Farm argues it should be granted summary judgment because the Taylors cannot prove there is no arguable reason State Farm denied part of their claim or that State Farm had knowledge that there was no arguable reason to deny part of the claim.

In their Response, the Taylors summarily argue that State Farm should not be granted summary judgment because of State Farm's alleged delay in paying anything on the Antique Dresser and not paying for the damage to the property. The Taylors do not cite any case law to support their position.

The Taylors must show that the absence of a debatable reason State Farm denied their claim is so great, they would be entitled to a directed verdict on the matter. Alfa Mut. Fire Ins. Co. v. Thomas, 738 So. 2d 815, 822 (Ala. 1992). "In short, plaintiff must go beyond a mere showing of nonpayment and prove a *bad faith* nonpayment, a nonpayment without any reasonable ground for dispute. Or, stated differently, the plaintiff must show that the insurance company had no legal or factual defense to the insurance claim." Nat'l Sec. Fire & Cas. Co. v. Bowen, 417 So. 2d 179, 183 (Ala. 1982).  Further,

> …where a "normal" bad-faith claims fails under the directed verdict standard so does an "abnormal" bad-faith claim. … To decide this case, we do not have to resolve this uncertainty about the applicability of the directed verdict standard to "abnormal" bad-faith claims. Regardless of the merits of a related contract claim, all bad-faith claims fail on summary judgment "where the trial court ... expressly [finds] as a matter of law that

the insurer had a reasonably legitimate or arguable reason for refusing to pay the claim at the time the claim was denied.

Walker v. Life Ins. Co. of North America, 59 F.4th 1176, 1187 (11th Cir. 2023) (citations omitted) (internal quotations omitted).

Here, the Taylors are unable to prove there is an absence of a debatable reason for State Farm to deny part of their claim under Coverage A and certainly cannot show that they are due a directed verdict on their claim of replacement cost value. The policy states that State Farm will provide payment for the claim once the repairs or replacement of the property is completed. The Taylors did not complete any repairs on the property although State Farm issued payments totaling $216,911.21 for repairs under Coverage A. Moreover, the Taylors have not rebutted that State Farm investigated the claim, continuously updated the Taylors on the status of their claim, and when the Taylors did not respond to their letters, State Farm continued pursuing the claim and attempting to get in touch with the Taylors.

As to the claim of bad faith for failure to timely pay at least the value State Farm ascribed to the dresser, i.e., $4636.50, the Taylors have failed to show sufficient evidence or cite any authority that the delay in payment amounted to constructive denial. See Cong. Life Ins. Co. v. Barstow, 799 So. 2d 931, 938 (Ala. 2001) ("…a plaintiff can establish a constructive denial in two ways: '(1) by showing that the passage of time is so great that the delay alone creates a denial; or (2) by showing sufficient delay in payment coupled with some wrongful intent by the insurance company.'" (quotation omitted)); New Hampshire Ins. Co. v. Blue Water OffShore, LLC., No. CIV.A. 07-0754-WSM, 2008 WL 682400 *3 (S.D. Ala. Mar. 7, 2008) ("A constructive denial arises upon the confluence of a sufficient delay and a wrongful intent."). It is not sufficient just to assert a 19-month delay, especially when the value of the property was in dispute. Accordingly, summary judgment is **GRANTED** as to the bad faith claim.

**IV.    Conclusion**

Summary Judgment is **GRANTED** on the breach of contract claim under Coverage A and all bad faith claims.  Summary judgement is **DENIED** as to the breach of contract claim under Coverage B.

**DONE** and **ORDERED** this **24th day** of **November 2025.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**